**Katherine TRAHARNE, Administrator of the Estate of Kenneth William Traharne, Deceased, Plaintiff,**

v.

**WAYNE/SCOTT FETZER COMPANY, Defendant.**

No. 97 C 4111.

United States District Court,
N.D. Illinois,
Eastern Division.

March 15, 2001.

Craig Edgar Anderson, Jacobson, Brandvik & Anderson, Joseph E. Tighe, Joseph E. Tighe, P.C., Chicago, IL, for Plaintiff.

Jeremiah P. Connolly, Bollinger, Ruberry and Garvey, Chicago, IL, for Defendant.

## *ORDER*

ROSEMOND, United States Magistrate Judge.

Before the Court is *"Defendant's Motion To Bar The Testimony Of Michael Morse"*. **The motion is granted in part and denied in part.**

The underlying action arises out of the electrocution death of a 15–year old boy who died while using a submersible pump manufactured by the defendant to remove accumulated rain water from an above ground swimming pool in his backyard. The product involved is a Wayne Model CDU 800 sump pump. The pump has an electric motor that is contained inside the metal body or "case" of the sump pump. Affixed to the top of the pump case is a switch housing, which is made of nonconductive plastic. It houses the two connection terminals for the electric motor (the "hot" and the neutral), as well as the ground terminal which is connected to the metal case of the sump pump. The sump pump's power cord, which connects the electric motor to an external power source, enters the pump through a seal arrangement in the top of the switch housing.

The seal is formed by a rubber grommet[1] which surrounds and fits tightly against the outer sheath of the power cord. Inside the switch housing, the sheath of the power cord terminates, exposing the individually insulated lead wires of the power cord. These lead wires, consisting of the "hot" wire, the neutral wire and the ground wire, connect to the two motor terminals and the ground terminal inside the switch housing.

The power cord is secured in the seal by means of a strain relief clamp. This clamp is crimped[2] tightly onto the sheath of the power cord in the assembly process. Because the outside diameter of the strain relief clamp is larger than the inside diameter of the hole in the rubber grommet through which the power cord enters the switch housing, the clamp prevents the power cord from being pulled out through the seal and allowing water to enter the switch housing.

The accident that is the subject of this litigation occurred on June 13, 1995. At that time, the plaintiff's decedent was using the sump pump to drain approximately 6 to 8 inches of water from a swimming pool in his backyard. Two days after the accident, on June 15, 1995, as part of its cause of death investigation, the McHenry County Sheriff's Office delivered the sump pump to Packer Engineering ("Packer"), an independent engineering firm, for analysis.

Packer carefully inspected, photographed and documented the condition of the sump pump and prepared a written report of its findings. Packer's photographs show that the power cord of the sump pump was pulled out of the watertight seal past the point where the outer sheath of the power cord terminates. This resulted in the three inner lead wires of the power cord, which are normally located inside the switch housing, being pulled up through the watertight seal. This, in turn, created a 1/16th inch gap in the watertight seal, which allowed water to enter the switch housing.

The Packer photographs also revealed the absence of a strain relief clamp either on the sheath of the power cord or inside the sealed switch housing. Significantly, the water from the decedent's swimming pool was still inside the switch housing when Packer first unscrewed the cover, indicating that the switch housing had remained screwed in place from the time of the accident until the time of Packer's inspection. Plaintiff maintains that the absence of a strain relief clamp proves that the sump pump was defectively manufactured.[3]

Although the Packer photographs show that the strain relief clamp was absent from the power cord and the switch housing, the photographs show distinct marks on the sheath of the power cord in the location where the clamp was supposed to be. These marks correspond precisely to the points around the circumference of the power cord to which a properly crimped strain relief clamp would apply pressure.

---

1. A grommet is described as a flexible loop that serves as a fastening, support or reinforcement. It is also described as an eyelet of firm material to strengthen or protect an opening or to insulate or protect something passed through it. *Merriam–Webster's Collegiate Dictionary,* at 514 (10th ed.1996).

2. Generally speaking, crimp means to cause to become wavy, bent, or pinched. In the context of this case, it appears to mean to pinch or press together. *Merriam–Webster's Collegiate Dictionary,* at 275 (10th ed.1996).

3. *"Plaintiff's Response To Defendant's Motion To Bar Opinion Testimony Of Michael Morse",* at 3.

Pursuant to plaintiff's *Second Amended Complaint,* plaintiff pursues two theories of liability, *to-wit:* negligent manufacture of the submersible pump and a defectively designed submersible pump. With respect to plaintiff's assertion that the pump was defectively designed, plaintiff charges that there should have been a supplemental restraint system in place on the pump. Plaintiff maintains that such a supplemental restraint system would have protected against the possibility that users, carrying the pump by the cord, would apply pressure on the strain relief clamp and might, ultimately, cause the strain relief clamp to fail, thereby allowing the power cord to be pulled out of the pump's housing while still attached to the pump's motor. Under such circumstances, argues the plaintiff, water would enter the pump, become electrified, and any individual exposed to that electrical force could suffer a fatal electrical shock.

Plaintiff's counsel hired Mr. Greg Kaplan to devise and fabricate a supplemental restraint for the exterior of the sump pump at issue and to provide an estimate of the manufacturing and supply costs for such a part. *As Mr. Kaplan himself states, he was retained "to make a clamp. [He] was not brought [into] [the case] to evaluate ... the existing unit."* [4] Mr. Kaplan was to offer an opinion on the supplemental restraint device designed by him and provide a basis for his belief that the device could be manufactured at a cost of less than 15¢ per unit. By *Order* dated February 15, 2001, the Court granted *"Defendant's Motion To Bar Testimony Of Greg Kaplan".* Accordingly, Mr. Kaplan will offer no expert testimony at trial. Nor will his supplemental restraint device be introduced into evidence.

To prove that the design of the sump pump is defective, the plaintiff retained as an expert witness, Dr. Michael S. Morse. It is Dr. Morse's opinion that, as a matter of engineering principles, a redundant safety system should have been considered and implemented in the design of the defendant's Wayne Model CDU 800 sump pump.[5] Such a safety system was particularly essential where, as in the instant case, "there is a risk that the existing safety system might fail and the impact of such a failure could be as serious as a fatality." [6] The redundant safety system advocated by Dr. Morse is according to the plaintiff very simple, *to-wit:*

> a second, exterior restraint fit between two screws already located on the pump's top through which the power cord would be channeled to the hole through which the power cord enters the pump. That device would create a second point of pressure (other than the hole in the top of the pump) which would restrain movement of the power cord if a person lifted the pump by its power cord rather than by its handle. The force of the weight of the pump would be felt at the point where the second restraint holds the cord, and holding the pump by the cord would not place any strain on the cord at the point in which the cord enters the pump. In that manner, the external strain relief system would have to fail before the internal strain relief clamp safety system would

---

4. Transcript of the November 22, 1999 deposition of Gregory R. Kaplan, at 22, *attached as Exhibit B to, "Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Gregory Kaplan"* (emphasis added).

5. *"Plaintiff's Response To Defendant's Motion To Bar Opinion Testimony Of Michael Morse",* at 4.

6. *Id.*

even be implicated.[7]

According to Dr. Morse, the defendant's Wayne Model CDU 800 sump pump has yet another defect in design. It is Dr. Morse's opinion that to have a reasonably safe product the defendant should have incorporated into its design of the Wayne Model CDU 800 sump pump a ground fault circuit interrupter on the pump's power cord.[8] Dr. Morse maintains that ground fault circuit interrupters are necessary where a product functions in an environment where there is both electricity and moisture. Dr. Morse is of the opinion that had a ground fault circuit interrupter been a part of the pump's design, even with the failure of the watertight seal, the decedent would not have been injured. According to Dr. Morse, the ground fault circuit interrupter would have automatically de-energized the circuit.[9] In other words, a ground fault circuit interrupter would have detected the sudden shift in current flow and shut off the power to the pump.[10] According to Dr. Morse, ground fault circuit interrupters "have become fairly common devices in new-home construction, particularly, in kitchens, bathrooms and ... other portions of the house where it is foreseeable that an electrical device could come into contact with water." [11]

Finally, Dr. Morse "will offer the opinion that the breach in the hole at the top of the pump caused plaintiff's decedent to die", and that an "electrocution death in circumstances such as those presented in this case is an extraordinarily painful and terrifying experience." [12]

■ *Under the Federal Rules of Evidence, it is the role of the trial judge to act as a "gatekeeper" and screen proffered expert testimony to ensure its relevance and reliability.*[13] At the outset, it must be noted that the rules of evidence embody a *strong preference for admitting any evidence which has the potential for assisting the trier of fact.*[14] Rule 702 of the *Federal Rules of Evidence* governs the admissibility of expert testimony and it too has a liberal policy of admissibility.[15] The Rule's liberal policy of admissibility is predicated on *"trust in the power of cross-examination to discern the truth,* and a fundamental belief in the role the jury plays as the finder of fact in our system of justice." [16] Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court.

7. *Id.,* at 4.

8. *Id.,* at 4.

9. Exhibit G, at 6, *"Defendant's Joint Appendix To It's Responses To Plaintiff's Motion For Sanctions, Motion To Bar The Testimony Of Richard Hansen, And Motion To Limit The Testimony Of Carl Frank ".*

10. *"Plaintiff's Response To Defendant's Motion To Bar Opinion Testimony Of Michael Morse ",* at 4.

11. *Id.*

12. *Id.,* at 4, 5.

13. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993).

14. *See, Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 780 (3d Cir.1996) (emphasis added).

15. *Holbrook,* 80 F.3d at 780; *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir. 1994).

16. Gerson H. Smoger, J.D., Ph.D., *"From Rule 702 To Daubert To Joiner To Kumho Tire: A Review Of The Supreme Court's Analysis Of The Admissibility Of Expert Testimony ",* Volume 16, No. 9, *Andrews Pharmaceutical Litig. Rep. 14* (February 2001) (emphasis added).

**[2]** *Rule 702 of the Federal Rules of Evidence sets the standard governing the admissibility of expert testimony.* The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[17]

Under Rule 702, the proffered witness must be an expert; the expert must testify about matters requiring scientific, technical or specialized knowledge; and the expert's testimony must assist the trier of fact.[18] Thus, under the rule, Dr. Morse may offer an expert opinion only if he is first found to be an expert; only if he draws on some specialized "knowledge, skill, experience, training, or education to formulate that opinion"; and only if his expert opinion, predicated on his expertise, will assist the trier of fact. Whether or not a witness qualifies as an expert is to be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness' testimony.[19]

■ *Established decisional law dictates that when confronted with a proffer of expert testimony, a trial court must undertake, in fulfilling its "gatekeeping function", a two-step analysis.*

First, the district court must determine whether the proffered expert testimony is reliable.[20] In other words, the trial court "should assure himself, before admitting expert testimony, that the expert knows whereof he speaks." [21] Subjective belief or unsupported speculation must be ruled out.[22] To be reliable an expert's opinion must pertain to "scientific knowledge" and be derived by the scientific method.[23] Second, the district court must determine whether the proffered evidence or testimony will assist the trier of fact in understanding the evidence or in determining a fact at issue.[24] Accordingly, we must view Dr. Morse's qualifications and proposed opinions within the parameters of these standards and guidelines.

■ *Dr. Morse is qualified as an expert by way of "knowledge, skill, experience, training or education."* Dr. Michael S. Morse is an Associate Professor of Electrical Engineering at the University of San Diego in California. He has a doctorate in Engineering from Clemson University in Clemson, South Carolina; a Master of Science and a Bachelor of Science from Tulane University in New Orleans, Louisiana; and a law degree from the University of San Diego. He is a member of several honorary societies, such as H.K.N., an Electrical Engineering Honor Society; Sigma Xi, a Research Honor Society; and Tau Beta Pi, an Engineering Honor Soci-

---

**17.** Rule 702, *Federal Rules of Evidence,* 28 U.S.C.A.; *see also, Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 723 (7th Cir.1999).

**18.** *Kannankeril v. Terminix International, Inc.,* 128 F.3d 802, 806 (3d Cir.1997).

**19.** *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990).

**20.** *Cummins v. Lyle Industries,* 93 F.3d 362, 367 (7th Cir.1996).

**21.** *Bammerlin v. Navistar International Transportation Corp.,* 30 F.3d 898, 901 (7th Cir. 1994).

**22.** *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1995).

**23.** Rule 702 of the *Federal Rules of Evidence; Daubert,* 509 U.S. at 590–91, 113 S.Ct. at 2795–96.

**24.** *Id.*

ety.[25]

Dr. Morse has expertise in "[e]lectric shock injury, electrical safety, electrical injury, effects of electricity on the human body, failure at the human/machine interface, and biomedical device failure (electromechanical)."[26] Dr. Morse has been a consultant in "several electric shock injury, electrocution, [and] electrical safety cases."[27] He has also been a consultant in "medical products failure cases involving electropapillotome, infusion pump, [and] thermal blanket."[28]

Dr. Morse has been a prolific writer with over 20 papers and publications to his credit.[29] Not all of his published works have been in the area of electric shock injury, however.

Dr. Morse has qualified and testified as an expert witness in several federal and state courts. He qualified as both a Biomedical and Electrical Engineering expert in the United States District Court for the Southern District of Alabama. He qualified as a Biomedical Engineer expert in the United States District Court for the Middle District of Florida, and testified on the subject of "Electrical Technology". In the United States District Court for the Eastern District of Louisiana, Dr. Morse qualified as an expert witness on "the effects of electricity on the human body."[30] In other federal and state courts, Dr. Morse has testified regarding (1) electrical product failure and resultant injury from an electrical connector, (2) electrical injury incurred while installing traffic lights, (3) injury from an electric arc, (4) electrical contact with overhead power lines, (5) the effects of electricity on the human body with regard to pain and suffering; and (6) the failure of a "man-lift" with emphasis on design, human factors and electrical circuitry.[31]

As testified to by Dr. Morse, the science of bioengineering "deals predominantly with the application of basic principles in engineering or engineering principles to technology as it deals with human beings and interface between man and machine."[32] His educational background focused upon, among other things, "safety in terms of the nature of engineering design itself; safety in terms of the interface between man and machine; safety in terms of ... the scope of ergonomics; [and] safety in terms of virtually any aspects of ... biomedical engineering."[33]

As noted above, Dr. Morse has the educational background and training in the areas of electrical safety and electric shock injury to qualify as an expert in these fields. In addition, Dr. Morse has the imprimatur of judicial approval as an expert in the areas of the effects of electricity on the human body and electrical product failure.

Although Dr. Morse has written extensively, the focus of his papers and publica-

**25.** Plaintiff's Exhibit A, at 2.

**26.** Plaintiff's Exhibit A, *"Plaintiff's Response To Defendant's Motion To Bar Opinion Testimony Of Michael Morse."*

**27.** *Id.*

**28.** *Id.*

**29.** Plaintiff's Exhibit A, at 3 and 4.

**30.** Plaintiff's Exhibit A.

**31.** Plaintiff's Exhibit A.

**32.** Transcript of the June 3, 1999 deposition of Dr. Michael Steven Morse, at 8, *attached as Exhibit H to, "Defendant's Joint Appendix To It's Responses To Plaintiff's Motion For Sanctions, Motion To Bar The Testimony Of Richard Hansen, And Motion To Limit The Testimony Of Carl Frank."*

**33.** Exhibit H, at 12.

tions has been speech analysis and human paralysis. It is only his most recent publication, of which he is a co-author, that appears to focus directly on issues present in the instant case, *to-wit:* a 1993 article styled, *"An Evaluation Protocol For Electric Shock Injury Supported by Minimal Diagnostic Evidence."*[34] This most recent publication "relate[s] to the evaluation of pain and suffering associated with electric shock"[35], and is predicated on many years of research and observation in the area of electrical shock injuries.[36] Over the years, Dr. Morse had observed that there was a class of electric shock injuries that had a common symptomatology that presented themselves with minimal diagnostic evidence.[37] The publication was subjected to the peer review of the *Institute of Electrical and Electronics Engineering in Medicine and Biology Conference* in San Diego, California and was approved and published by it.[38] Given that the decedent died of electrocution, Dr. Morse's expertise in the area of electrical injuries is relevant and should be of assistance to the trier of fact.

Even Dr. Morse's writings in the areas of speech analysis and human paralysis may well reflect a magnitude of expertise on the neurological functions of the human body. In this regard, it must be noted that Dr. Morse holds a patent on an electrical stimulator that involves applying electrical signals to the human musculature.[39] The primary goal of Dr. Morse's electrical stimulator is to provide assist-technology to individuals with spinal injuries or other forms of paralysis.[40] As is well-recognized in Dr. Morse's field, elec-trical stimulation can cause an individual's muscles to contract.[41] Dr. Morse's patented stimulator uses electrical stimulation to assist or directly control the muscles of an individual who because of partial or complete paralysis has limited control of musculature or no control of musculature.[42] It is therefore reasonable to conclude that Dr. Morse has expertise in the area of the neurological functioning of the human body. His general knowledge, research, readings, and experience in this area is relevant and should be of value to the trier of fact.

None of Dr. Morse's papers, publications, or proffered opinions strikes us as being extreme or touching upon **novel or controversial** areas of engineering, science, or the field of electricity, in general, or electric shock injury, in particular. The opinions that he anticipates giving in this case rest on anecdotal data, personal experiences, observations, laboratory testing, research, and academic study and training. Much rests on the papers and publications of other experts and of the investigative work and research done in connection with his consultation and expert witness services in numerous state and federal litigations involving electrical injuries. Thus, his opinion testimony rests on matters growing naturally out of his background and work experience, are independent of the instant litigation, and were not developed expressly for testifying in the instant litigation, all of which are *indicia* of reliability.

---

34. Plaintiff's Exhibit A, at 3.

35. Exhibit H, at 31.

36. Exhibit H, at 33.

37. Exhibit H, at 33.

38. Exhibit H, at 31–33.

39. Exhibit H, at 21.

40. Exhibit H, at 22.

41. Exhibit H, at 22.

42. Exhibit H, at 22.

We conclude that Dr. Morse has sufficient qualifications to testify as an expert. We also conclude that his qualifications, particularly, his judicial recognitions as an expert in the area of electric shock injuries constitute circumstantial evidence that he has employed scientifically valid methodologies and reasoning in arriving at the opinions he expects to give in this case.[43]

■ *The requirement that an expert be qualified by knowledge, skill, experience, education, or training should not be viewed as being particularly rigorous.*[44] A witness may qualify as an expert even if the opposing party can point to deficiencies in his or her qualifications.[45] Once a witness passes the threshold of knowledge, skill, experience, training, or education to qualify as an expert, any shortcomings or deficiencies which he or she possesses are reserved for cross-examination.[46] We find and conclude that Dr. Morse has passed this initial Rule 702 threshold.

■ *Next, we must determine whether the proposed expert's testimony pertains to "scientific, technical or other specialized knowledge."*[47] In other words, an expert's opinion must be predicated on valid reasoning based on what is known, and supported by appropriate validation, that is, reliable methodology or technique.[48] This requirement is satisfied when the proposed opinion is based on "good grounds".[49] In this regard, the trial judge determines whether the expert came to his conclusion by employing the same methodology that the expert would employ in his professional life.[50] This determination "requires more of an explication by the expert than simply a statement that 'I relied on my vast experience'."[51] The issue of which expert's opinion has the best foundation should be left to the trier of fact.

■ *To some extent Dr. Morse's proffered expert testimony must be viewed in the context of Illinois product liability law.* In diversity actions, federal courts apply federal procedural rules and state substantive law.[52] Thus, Illinois law governs the product liability issues in this case. Where, as here, a plaintiff alleges that the design of a product is defective, Illinois law provides such plaintiffs with two approaches by which to impose liability. A plaintiff may introduce evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.[53] This method of proof has been called the "consumer-contemplation" or "consumer-expectation" test. Thus, under the "consumer-contem-

---

43. *See generally, Ambrosini v. Labarraque*, 101 F.3d 129, 140, 322 U.S.App.D.C. 19, 30 (D.C.Cir.1996).

44. *Kent v. Howell Electric Motors,* 1999 WL 517106 * 3 (E.D.Pa. July 20, 1999).

45. *Id.*

46. *Kannankeril v. Terminix Int'l., Inc.,* 128 F.3d 802, 809 (3d Cir.1997).

47. Fed.R.Evid. 702.

48. *Kannankeril,* 128 F.3d at 806 and 807.

49. *Kannankeril,* 128 F.3d at 807.

50. Capra, Daniel J., *"The Daubert Puzzle "*, 32 Ga. L.Rev. 699, 781 (Spring 1998).

51. *Id.*

52. *See, Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1033 (7th Cir.1998), *citing, Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

53. *Wheeler v. Chrysler Corporation,* 2000 WL 263887 at *2 (N.D.Ill. March 1, 2000), *citing, Lamkin v. Towner,* 138 Ill.2d 510, 529, 150 Ill.Dec. 562, 563 N.E.2d 449, 457 (Ill.1990).

plation" test, a product is unreasonably defective when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." [54]

Alternatively, a plaintiff may utilize the "danger-utility" or the "risk-benefit" test, which seeks to demonstrate that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in the design.[55]

■ Under the risk-utility test, or danger-utility test:

a product is defective if, but only if, the magnitude of the danger outweighs the utility of the product. The theory underlying this approach is that virtually all products have both risks and benefits and that there is no way to go about evaluating design hazards intelligently without weighing danger against utility. There have been somewhat different ways of articulating this ultimate standard or test. But in essence, the danger-utility tests directs the attention of attorneys, trial judges, and juries to the necessity of weighing the danger-in-fact of a particular feature of a product against its utility. Under this test, a product can be said to be defective in the kind of way that makes it "unreasonably dangerous" if a reasonable person would conclude that the danger-in-fact,

whether foreseeable or not, outweighs the utility of the product.[56]

Accordingly, under the risk-utility test, a product is deemed unreasonably dangerous when the evidence establishes that the product "could have been designed to prevent a foreseeable harm without hindering its function or price." [57]

As noted earlier, Dr. Morse will offer three main opinions at trial, *to-wit:* (1) that the design of the Wayne Model CDU 800 sump pump is defective in that the strain relief mechanism is inadequate to secure the power cord in the watertight seal during foreseeable uses of the pump; (2) that the breach of the watertight seal caused the decedent's electrocution; and (3) that the decedent experienced severe pain as well as other effects of electric shock. Presumably, opinions (1) and (2) are directed to the risk-utility approach.

■ At the outside, it must be noted that Dr. Morse reached his conclusions *"after spending only four hours reviewing documents in his office in San Diego."* [58] Dr. Morse was of the opinion that he had done everything necessary to formulate his opinions in this case.[59] The amount of time and work expended by an expert in familiarizing himself with a particular case; in culling key facts from the documentation presented to him; and in developing the factual predicate for his opinions clearly goes to his appropriate case, the amount of time and work expended may also go to the issue of whether or

---

**54.** *Wheeler v. Chrysler Corporation,* 2000 WL 263887 at *2 (N.D.Ill. March 1, 2000), *citing, Lamkin v. Towner,* 138 Ill.2d 510, 529, 150 Ill.Dec. 562, 563 N.E.2d 449, 457 (Ill.1990).

**55.** *Id.*

**56.** *Wheeler,* 2000 WL 263887 at *4; *See also, Scoby v. Vulcan–Hart Corp.,* 211 Ill.App.3d 106, 110, 155 Ill.Dec. 536, 569 N.E.2d 1147, 1150 (Ill.App.Ct.1991).

**57.** *Besse v. Deere & Co.,* 237 Ill.App.3d 497, 500–01, 178 Ill.Dec. 475, 604 N.E.2d 998, 1001 (Ill.App. 3 Dist.1992).

**58.** *"Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse",* at 4 (emphasis added).

**59.** Exhibit H, at 102.

not the expert's opinion is predicated on a reliable methodology or technique. Although the limited time expended by Dr. Morse is troubling, given his expertise and background, it may well be sufficient. In any event, we believe that sound discretion dictates that we permit the trier of fact to take into account the time expended by him when weighing and considering his opinion testimony.

At the outset, it must also be noted that Dr. Morse "did not inspect the sump pump or the short-circuited extension cord involved in the decedent's accident."[60] Nor did he review any photographs of the sump pump or its strain relief mechanism. As an expert witness, Dr. Morse "was not required to have direct evidence or a personal observation" of the decedent's sump pump or the short-circuited extension cord.[61] *An "expert is not always required to personally perceive the subject of his analysis."*[62] Accordingly, Dr. Morse's omissions in this regard go only to his credibility and to the weight to be given to his opinions. These omissions would have greater force, but for the fact that Dr. Morse did receive, inspect, and examine an exemplar Wayne Model CDU 800 sump pump sent to him by plaintiff's counsel.[63]

Perforce, the exemplar sump pump differed from the sump pump *sub judice* in a number of respects. For example, the sump pump at issue had water from the decedent's swimming pool inside the switch housing. In addition, there was "no strain relief clamp either on the power cord or inside the switch housing" on the sump pump at issue.[64] However, there is no dispute that the exemplar model sent to Dr. Morse reflects the proper placement and operation of the strain relief clamp for a properly manufactured and assembled Wayne Model CDU 800 sump pump. Although Dr. Morse did not receive or examine the photographs of the sump pump at issue taken by Packer Engineering, he did receive and study Packer Engineering's report of its findings and conclusions.[65] Accordingly, except when based on his own specialized knowledge, experience, and expertise, Dr. Morse's opinions are limited to the exemplar sump pump and whatever engineering reports, Underwriters Laboratories standards and guidelines, and other documentation and materials shown to him, because that is all that he has inspected, studied, and analyzed. His limitations in this regard may be fully explored on cross-examination. As we noted earlier, these shortcomings go to the weight to be given his opinions. They ought not to preclude him from proffering an opinion.

■ *Defendant's first challenge to Dr. Morse.* Defendant charges that Dr. "Morse assumed without any scientific analysis [or testing] that the breach of the watertight seal, which allowed some water to enter the sump pump's insulated switch housing, produced the required 50 to 100 milliamps of electric current in the surrounding pool water."[66] Dr. Morse is of

---

60. *"Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse"*, at 4 (Morse deposition citations omitted).

61. *NutraSweet Company v. X–L Engineering Company,* 227 F.3d 776, 789 (7th Cir.2000).

62. *NutraSweet,* 227 F.3d at 790 (emphasis added).

63. Exhibit H, at 75.

64. *"Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse"*, at 3.

65. Exhibit H, at 79 and 80.

66. *Id.*

the opinion that the source of the electricity that electrocuted the decedent was the sump pump. Dr. Morse maintains that a second, redundant safety measure on the submersible pump would have protected against the risk that the pump's power cord would be pulled from the pump in such a manner that would cause a breach in the watertight seal and allow water to enter the pump's housing while the pump was in operation.[67] His opinion in this regard is based on the documents and materials given to him, his experience, and his specialized knowledge, all backed by his academic training and his observations and research in connection with his consultation services and expert witness services in other state and federal litigation involving electrical injury issues. As such it is not speculative.[68] It is based on his expertise. Even if his opinions were based on *inferences* drawn collectively from the documents and materials given to him to review, his experience, and his specialized knowledge, it would not render his opinions speculative.[69] Dr. Morse's conclusions in this regard may well be incorrect or his analysis flawed. However, a trial court "should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect."[70] The court "should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."[71] We believe that the flaws, if any, are not so significant as to preclude plaintiff from having her day in court. Cross-examination will illustrate the thoroughness *vel non* of Dr. Morse's investigative processes and the logic of his reasoning.

■ *Defendant charges that Dr. Morse's opinions are unreliable* because he "failed to rule out or even consider an obvious alternative cause of the decedent's electrocution—the short circuit in the extension cord."[72] Contrary to the defendant's assertions, Dr. Morse did consider the short circuit in the extension cord. It is Dr. Morse's opinion that the short circuit could not have caused the decedent's death because that type of short would have energized the casing of the sump pump and given the decedent a minor non-lethal shock forcing him to drop the pump long before he reached the water:

> [T]he pump casing would have been energized at the point that [the decedent] picked up the pump before it ever got to being in the water. He would have received a shock prior to ever getting in the pool. He would have known that the pump was dangerous and would have never gotten to the point where he was at.[73]

According to Dr. Morse, "it is a genuine foreseeability of [the extension] cord being pulled out of [the] Wayne CDU 800 sump pump and flooding the sump pump to cause a short circuit."[74] Defendant mocks this idea because the casing of the sum pump is purportedly made of non-conductive plastic. At his deposition, there was no appreciable cross-examination of Dr.

---

67. *Id.*, at 3 and 4.

68. *See, NutraSweet*, 227 F.3d at 789.

69. *Id.*

70. *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 746 (3d Cir.1994).

71. *Id.*

72. *"Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse"*, at 22.

73. Exhibit H, at 139. *See also*, Exhibit H, at 138 and 139.

74. Exhibit H, at 159.

Morse on this subject. Nor was he asked if his opinion would remain the same if the switch housing of the sump pump were made of non-conductive plastic. Nor was there any rehabitative examination wherein Dr. Morse might have clarified or explained his position. *In any event, factual inaccuracies are to be explored through cross-examination.*[75] Whether or not Dr. Morse's opinions rest in part on an incorrect fact goes to the weight and credibility of his testimony—not its admissibility.

Among the general, non-dispositive, non-exclusive, flexible factors that courts generally weigh and consider in determining whether or not a proffered expert's testimony is predicated on valid reasoning, that is, reliable methodology or technique are (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, which analysis we do not find applicable here; and (4) whether the theory has been generally accepted.[76] We address these factors *in seriatim.*

*Defendant challenges Dr. Morse's opinion that the Wayne Model CDU 800 sump pump would be safer if it had a supplemental restraint system or device.* Defendant charges that Dr. Morse can proffer no opinion in this area because he "has no idea what caused the strain relief clamp to allegedly 'fail,' [or] when or how the failure occurred, or the forces or mechanism that caused the failure." [77]

It is Dr. Morse's opinion that if the strain relief clamp had functioned as intended, then the extension cord would not have been pulled out of the seal.[78] He did not test his theory that the Wayne Model CDU 800 sump pump was defective because it lacked a supplemental restraint system. In formulating his opinion regarding the design of the defendant's Wayne Model CDU 800 sump pump, Dr. Morse considered the human aspects factors and the technology of the design itself:

> *Dr. Morse*: ... I'm presented with a scenario where we know it [*to-wit*: the strain relief system] to have failed. I believe that using it as it was used is probably *foreseeable to a design engineer.*[79]

In examining the Wayne Model CDU 800 sump pump, the defect concerning the lack of a supplemental restraint system was *"obvious "* to Dr. Morse.[80]

*Whether the theory or technique can be or has been tested.* It is Dr. Morse's opinion to a reasonable degree of engineering certainty that the sump pump's watertight "seal failed because of the fact that it was not able to take up the strain over the lifetime of its use," [81] and that because of the lack of a supplemental restraint system "[electric] current ... traveled from the hot wire through the water [and] was able to enter the pump housing *via* the failed seal into and through [the decedent] and then out through the pool water to any

---

75. *See generally, Walker v. Soo Line Railroad Company,* 208 F.3d 581, 586, 589 (7th Cir. 2000).

76. *Daubert,* 509 U.S. at 593, 594, 113 S.Ct. at 2796, 2797.

77. *"Reply Brief In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse "*, at 4.

78. Exhibit H, at 105–107, and 112–121.

79. Exhibit H, at 117 (emphasis added).

80. Exhibit H, at 95 and 96, 103 and 104.

81. Exhibit H, at 104.

or several available ground sources."[82] Dr. Morse reasoned as follows:

> **Dr. Morse**: I think it's best to state my opinion as recognizing that the nature of the strain relief, the nature of the design was such that seal failure was possible whether it was the result of relaxation of the rubber or some other mechanism. We know for a fact that the seal did fail, and water was able to get in. In looking at the seal it is relatively easy to find a means by which that failure could occur.[83]

Dr. Morse states that his opinions and conclusions are based on generally accepted engineering principles and reasoning which he himself teaches at the University.

As noted earlier, photographs of the independent investigative engineering firm of Packer Engineering, Inc. show that the power cord of the sump pump at issue was pulled out of the watertight seal past the point where the outer sheath of the power cord terminates. This resulted in the three inner lead wires of the power cord, which are normally located inside the switch housing, being pulled up through the watertight seal. This, in turn, created a 1/16th inch gap in the watertight seal, which allowed water to enter the switch housing. Since the record reveals that the power cord was pulled out of the watertight seal and that there was water in the switch housing of the pump, Dr. Morse's opinion does fit the facts that plaintiff expects to prove at trial and some facts already known. No one knows whether the strain relief clamp failed, was dislodged by force, was voluntarily removed by the decedent or a member of his family, or was negligently omitted during the defendant's manufacturing and assembly processes. In any event, how close the

evidentiary fit of Dr. Morse's testimony we leave to the jury.

■■■ Dr. Morse reviewed matters and inspected materials which he believed were important. And, he elected not to review or test matters where he deemed it unreasonable to do so:

> **Defense counsel**: Have you [Dr. Morse] done anything to specifically test or evaluate whether if you submerged the sump pump and pulled the cord free of the seal, you can generate enough electricity in the water through this mode of short circuiting the pump to deliver a fatal electric shock?

> **Dr. Morse**: It's not reasonable to do a test like that.

> **Defense counsel**: Why not?

> **Dr. Morse**: Because any situation I could produce would have some variances as to be almost wholly different from the instance of this injury.

> **Defense counsel**: It's not something you have attempted to do?

> **Dr. Morse**: It's not something I would attempt to do.[84]

Dr. Morse's judgment calls regarding whether or not to conduct tests are based on his specialized knowledge, and his general knowledge and experience acquired over many many years. Work experience, consultations with peers, attendance at educational seminars, study, research, and general knowledge acquired over a several-year period give his opinions sufficient indicia of reliability. Moreover, the validity of Dr. Morse's decision not to perform any testing will be subject to rigorous cross-examination:

---

**82.** Exhibit H, at 132 and 133.

**83.** Exhibit H, at 103 and 104.

**84.** Exhibit H, at 135.

*[E]xpert testimony should be admitted so long as it can be adequately tested by the adversary. It is not up to the judge, even after Daubert, to scrutinize expert testimony so strictly that only the perfect expert will be permitted to testify.*[85]

Dr. Morse's methodology or review differs significantly from that employed by the defendant's experts. Still, Dr. Morse's method is not ostensibly unreliable. As noted above, his opinions are based on more than just his personal observations and experiences, they are based in part on the work done by him in connection with his publications and his consulting and expert witness services in other state and federal cases. Whether an expert might have done a better job is not the test for the admissibility of his testimony.[86] Accordingly, whether Dr. Morse's methodology was the *most* reliable or the *best*, we think is best left to the trier of fact to decide. Where, as here, an expert*is highly qualified, "a trial court should be especially reluctant to exclude a disputed methodology...."[87]

■■■■ At the outset, further notice must be made of the fact that Dr. Morse did not develop an alternative strain relief clamp or mechanism that was an improvement over the defendant's design or was in any way safer than the defendant's:

*Defense counsel*: Is it your opinion [Dr. Morse] that the sump pump involved in this accident is unreasonably dan-

gerous and defective without this device [that is a supplemental external strain relief clamp]?

*Dr. Morse*: Without appropriate modifications to the strain relief system, yes.

*Defense counsel*: But you haven't come up with some other appropriate modification?

*Dr. Morse: No one asked me to.*[88]

Under Illinois decisional law, a risk-utility plaintiff is not required to produce evidence of an economical alternative design.[89] Rather, once an Illinois risk-utility plaintiff has offered evidence of proximate causation, the burden shifts to the defendant to establish that on balance the benefit of the challenged design outweighs the risk of danger inherent in the design.[90]

Dr. Morse can specifically point to wherein the defendant's design is defective *and* wherein a proposed modification is be most helpful to the jury. The fact that he has not performed any testing or engineering analysis relating to his suggested modifications will go to the weight to be given his opinions in this regard.

*Testing is an acknowledged part of the design process.* However, the *Daubert* gatekeeping function of trial courts was not meant to force product liability plaintiffs to obtain as experts inventors or designers of new and improved products in order to succeed in products liability litigation. Product design is achieved over many years of research and testing by

85. Capra, Daniel J., *"The Daubert Puzzle"*, 32 Ga. L.Rev. 699, 705 (Spring 1998) (emphasis added).

86. *Kannankeril v. Terminix International, Inc.*, 128 F.3d 802, 809 (3d Cir.1997).

87. Capra, Daniel J., *"The Daubert Puzzle"*, 32 Ga. L.Rev.;699, 712 (Spring 1998) (*"it stands to reason that there should be some judicial deference to an outstanding expert"*).

88. Exhibit H, at 124 (emphasis added).

89. *Wheeler*, 2000 WL 263887 at *4.

90. *Id.* Proximate causation is established when there exists a reasonable certainty that the defendant's acts caused the injury. *Schultz v. Hennessy Indus., Inc.*, 222 Ill. App.3d 532, 541, 165 Ill.Dec. 56, 584 N.E.2d 235, 241 (Ill.Ct.App.1991).

corporate Research and Development Departments and only, after the expenditure of huge sums of money and manpower. Such testing expenditures would be cost prohibitive for the vast majority of plaintiffs. To require physical testing of an expert's opinions before the expert is permitted to testify would mean the elimination of product liability suits by ordinary non-corporate citizens. No ordinary citizen could afford such prohibitive up front litigation costs. Dr. Morse states that his opinions are predicated on generally accepted engineering principles and his expertise. Whether or not what he did, including what he did not do in formulating his opinions, or how he reasoned is persuasive or credible, we leave to the trier of fact. We recognize that a number of courts have barred experts from testifying where the experts have not tested their proposed modifications.[91] Still, we think that *"shaky" expert testimony is to be regulated by cross-examination and jury deliberation* [92], and that it would not be an abuse of our discretion to permit Dr. Morse to testify to what he believes is an *"obvious"* defect in design:

> Admission of ... testimony does not constitute an abuse of discretion merely because the factual basis for an expert's opinion is weak.[93]

The better course of action remains to trust the jury process, and give plaintiff her day in court.

As noted earlier, on February 15, 2001, the Court granted *"Defendant's Motion To Bar Testimony Of Greg Kaplan"*. Accordingly, Mr. Kaplan will offer no expert testimony at trial regarding alternative designs of the sump pump. Nor will his supplemental restraint device be introduced into evidence.

■ In light of our ruling on *"Defendant's Motion To Bar Testimony Of Greg Kaplan"*, Dr. Morse may not reference any of Mr. Kaplan's proposed opinions and testimony or Mr. Kaplan's proposed supplemental restraint device.

***Whether the theory or technique has been subjected to peer review and publication.*** This is not a situation where the expert's opinion is in conflict with others in the field who have published papers and articles on the subject. It is a situation where apparently no one has ever written on the subject. In any event, it appears that neither Dr. Morse nor the defendant knows whether any theories concerning the need for a supplemental restraint clamp have ever been subjected to peer review or publication. Given the time restraints of litigation and the limited monetary funds of ordinary people who find themselves plaintiffs in product liability or similar defective design cases, the fact that Dr. Morse himself did not submit for peer review his theory of the need for a supplemental restraint device on sump pumps similar to the defendant's can not be viewed as a *definitive* evidence preclusion factor. The need for supplemental restraint devices may not have been deemed a subject of any great significance by experts in the field. In addition, the need may not have been readily apparent to the experts in the field if the known electrocutions similar to that sustained by the decedent were not reported or were few in number. Although one such electrocution is one too many. It must always be re-

---

91. *See, e.g., Cummins v. Lyle Industries,* 93 F.3d 362 (7th Cir.1996).

92. *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 (emphasis added).

93. *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549 (D.C.Cir.1993). *Accord, Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222 (N.D.N.Y.1994) and *Edwards v. ATRO SpA,* 891 F.Supp. 1074, 1084 (E.D.N.C.1995).

membered that the "law does not preclude recovery until a 'statistically significant' number of people have been injured...." "[94]

It does not strike us as reasonable to expect a plaintiff's product design expert to contact others in the industry to see if they have ever proposed, discussed, or attempted creation of a supplemental restraint device or system for sump pumps similar to the defendant's. How many peers, manufacturers, academicians or engineering professors would Dr. Morse have to submit his ideas to in order to be deemed to have submitted his ideas to sufficient scrutiny.[95] And who, amongst his peer group, would he have to submit his ideas to in order to be deemed to have submitted his ideas to men and women of sufficient stature in the industry that their ideas would count. How would Dr. Morse contact or converse with peers or manufacturers in the industry or academia? It is unlikely that they would talk to him for free. What ordinary rank and file member of the general public could afford the costs of such consultations or of such a peer survey? There may be any number of reasons why the idea of a supplemental restraint device has not been the topic of peer review or publication. We think Dr. Morse's non-pursuit of peer review should be left to the trier of fact to weigh and consider.

It is true that Dr. Morse did not conduct any patent search to determine whether supplemental restraint devices on sump pumps ever existed, were ever proposed, or are feasible.[96] He did not conduct any

surveys regarding consumer concerns or fears or even experiences with such sump pumps. Nor did Dr. Morse consult any sump pump manufacturers. It is highly unlikely that any sump pump manufacturer would have permitted a stranger to talk to its Research and Development Department. Nor is it likely that any manufacturer would divulge to Dr. Morse that some of their design engineers had proposed a supplemental restraint device or system, but that company executives had vetoed the matter, preferring to risk product liability litigation rather than expend the minimal, but additional costs to employ such a device onto the sump pump. Again, we do not view Dr. Morse's omission in this regard as a preclusive factor, barring him from testifying.

*Whether the theory has been generally accepted.* There is no evidence that Dr. Morse's idea of a supplemental restraint device has been generally accepted. On the other hand, there is no indication that it has been generally disapproved either. In any event, while "[g]eneral acceptance in the relevant scientific community may be sufficient to permit the admissibility of expert testimony... it is no longer required." [97] It now is a guideline. Accordingly, it appears that our reasoning with respect to whether or not Dr. Morse's theory has been subjected to peer review should also apply with equal force to whether Dr. Morse's theory has been generally accepted.

Finally, we note that Dr. Morse did not perform any cost feasibility studies regarding his proposed supplemental restraint

**94.** *Ambrosini v. Labarraque,* 966 F.2d 1464, 1467 (D.C.Cir.1992), *quoting, Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1536 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

**95.** *Contra, Pestel v. Vermeer Manufacturing Company,* 64 F.3d 382, 384 (8th Cir.1995).

**96.** *Id.,* at 384, 385.

**97.** *Ambrosini v. Labarraque,* 101 F.3d 129, 134, 322 U.S.App.D.C. 19, 25 (D.C.Cir.1996).

modification. We suspect that this is due to the fact that it was anticipated that plaintiff's proffered expert, Mr. Greg Kaplan would speak to this subject. However, as noted earlier, Mr. Kaplan did not qualify as an expert on this subject. In any event, Dr. Morse's inability to speak to the subject goes to the overall weight to be given his opinions regarding his proposed supplemental restraint modifications.

***Dr. Morse's ground fault circuit interrupter opinion.*** It is Dr. Morse's opinion that a ground fault circuit interrupter should have been incorporated into the sump pump's power cord. Dr. Morse believes that ground fault circuit interrupters are necessary where a product functions in an environment where there is both electricity and moisture. According to Dr. Morse, had a ground fault circuit interrupter been part of the sump pump's design, the decedent would not have bene mortally injured, even with the failure of the pump's watertight seal.[98] The ground fault circuit interrupter would have automatically de-energized the circuit.[99] Given the current state of engineering, it is Dr. Morse's opinion that not including a ground fault circuit interrupter in the design makes the Wayne Model CDU 800 sump pump unreasonably dangerous.[100] His opinion in this regard is based on his experience, expertise, laboratory research relating to "the application of ground fault circuit interrupters and other kinds of leakage current protection devices," [101] and

his research done in connection with his consulting and expert witness services in various state and federal lawsuits involving issues of electrical safety, product electric injury risks, and the effects of electricity on the human body.[102] Although he believes that a ground fault circuit interrupter should have been a part of the sump pump design, Dr. Morse performed no analyses of the feasibility or cost-effectiveness of incorporating this device into the defendant's Wayne Model CDU 800 sump pump. He is unaware of any standards or codes that require or recommend ground fault circuit interrupters for sump pumps.[103] Finally, Dr. Morse concedes that under certain circumstances even ground fault circuit interrupters are not fool-proof. However, it remains his belief that had the defendant incorporated into its sump pump design a ground fault circuit interrupter it would have prevented the decedent's death.

Analyzing Dr. Morse's ground fault circuit interrupter opinions under the *Daubert* reliability factors such as whether the theory or technique has been tested, or subjected to peer review, or generally accepted by the expert's field or discipline, generates the same rulings, rationale, and analysis as was made with respect to Dr. Morse's supplemental restrain design modification opinions. There are some problems with Dr. Morse's overall opinions on the design of the sump pump. However, Dr. Morse is of the opinion that his pro-

**98.** *Report of Findings*, at 6 (April 5, 1999) (Dr. Morse), *attached as Exhibit G to, "Defendant's Joint Appendix To It's Responses To Plaintiff's Motion For Sanctions, Motion To Bar The Testimony Of Richard Hansen, And Motion To Limit The Testimony Of Carl Frank ".*

**99.** Exhibit G, at 6, *"Defendant's Joint Appendix To It's Responses To Plaintiff's Motion For Sanctions, Motion To Bar The Testimony Of Richard Hansen, And Motion To Limit The Testimony Of Carl Frank ".*

**100.** Exhibit H, at 149.

**101.** Exhibit H, at 42 and 43.

**102.** Exhibit H, at 43–48, and 65–67.

**103.** *"Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse ",* at 6.

posed design modifications are **obvious** to anyone with an engineering background. Whether this is so is best left to a jury to decide.

*Dr. Morse is of the opinion that the decedent suffered ventricular fibrillation as a result of an electric current that passed directly through his heart.*[104] Defendant challenges Dr. Morse's opinions in this regard on the grounds that they are based on assumption and ignorance of the true and undisputed facts in the case. These matters go to the weight to be given to Dr. Morse's opinions, and should be left to the trier of fact to consider. Moreover, although there are some facts which are not in dispute, there are some purported "undisputed facts" which the plaintiff challenges. The parties are not in complete agreement regarding what is in dispute and what is not.

There is no apparent dispute that the decedent suffered ventricular fibrillation as a result of an electric current that passed directly through his heart. And, there is no strong dispute that the range of electricity necessary to cause ventricular fibrillation is either between 60 milliamp and 100 milliamp or 50 milliamp and 100 milliamps. The issue is, and what the experts will battle over, is what is the source of the electricity for such a lethal dosage of electricity? Defendant maintains that it was the short-circuit in the extension cord. Plaintiff states that it was the entrance of water into the switch housing of the sump pump and the water's contact with the wiring therein. This is the classic battle of the experts, which a jury is fully capable of resolving.

*Dr. Morse's final opinion concerns the amount of pain and suffering experi-* *enced by the decedent.* Clearly, Dr. Morse's entire background speaks to this subject. As noted earlier, Dr. Morse has testified as an expert witness in a number of lawsuits on the subject of the effects of electricity on the human body.[105] He was retained as an expert witness by the Office of the Governor of the State of Florida and the Florida Attorney General's Office to testify in a lawsuit against a Florida state prison warden regarding the nature of the pain and suffering experienced by death row inmates under the State's then current electrocution execution system.[106] Unquestionably, his opinions on this subject are predicated on his specialized knowledge and will be of great assistance to the trier of fact. The fact that he did little or no testing, research, scientific analysis for the instant case in support of his opinions goes to his credibility and the weight to be given his testimony.

Likewise, the same must be said for Dr. Morse's opinion that the "human fear response" exacerbated the decedent's pain and suffering. This opinion is also based on his specialized knowledge. And he has spoken on the subject in a number of electric shock trials.

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1. "*Defendant's Motion To Bar The Testimony Of Michael Morse*" is granted in part and denied in part.

2. "*Defendant's Motion To Bar The Testimony Of Michael Morse*" is granted to the limited extent that, given the Court's grant of "*Defendant's Motion To Bar Testimony Of Greg Kaplan*", Dr. Morse may not reference any of Mr. Kaplan's proposed opinions and testimony or

104. "*Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse*", at 7.

105. *See, e.g.,* Exhibit H, at 51.

106. Exhibit H, at 57–62.

Mr. Kaplan's proposed supplemental restraint device or modification.

3. Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, the parties are given 10 days after being served with a copy of the Order to file exceptions thereto with The Honorable Ronald A. Guzman. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's Order.[107]

*So Ordered.*

---

**107.** *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986). *See also, Provident Bank v. Manor Steel Corporation,* 882 F.2d 258, 261 (7th Cir.1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's Order).