**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 1 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MORRISON ENTERPRISES, a
Kansas general partnership,

      Plaintiff - Appellant/Cross-
      Appellee,

v.

McSHARES, INC., a Kansas
corporation,

      Defendant - Appellee/Cross-
      Appellant.

Nos. 98-3219 & 98-3229

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 94-1219-MLB)**

---

Submitted on the briefs:[*]

Donald W. Bostwick, Clifford L. Malone, Patrick B. Hughes of Adams, Jones,
Robinson and Malone, Chartered, Wichita, Kansas, for the Plaintiff-
Appellant/Cross-Appellee.

Thomas D. Kitch, Scott D. Jensen, Lyndon W. Vix of Fleeson, Gooing, Coulson
& Kitch, L.L.C., Wichita, Kansas, for the Defendant-Appellee/Cross-Appellant.

---

    [*] This matter was scheduled for oral argument Tuesday, September 11,
2001. Due to the tragic events of the day, counsel was unable to complete oral
argument. Per counsel's request, this matter was ordered submitted on the briefs.

Before **HENRY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

_____

**LUCERO**, Circuit Judge.

_____

After a bench trial, the district court granted defendant judgment in plaintiff's suit under the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675. We conclude that the district court failed to grant plaintiff a presumption to which he was entitled under CERCLA. Exercising our jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the judgment of the district court and remand for further proceedings.

## I

Plaintiff, Morrison Enterprises ("Morrison"), is a general partnership that owns land in Salina, Kansas, including grain elevators and related buildings. Morrison operated those facilities until 1980, when it began leasing the site to another corporation.

Defendant, McShares, Inc. ("McShares"), is the successor in interest to Research Products Company, which supplied grain fumigants to Morrison for use at the grain elevator facility from the 1950s until approximately 1985. Throughout that period, McShares sold Morrison liquid grain fumigants containing carbon tetrachloride to be applied to the grain within the elevators and

-2-

other buildings on the property. In November 1963 there was a spill of liquid grain fumigants on the Morrison property when a McShares employee was preparing to unload fumigant for delivery to Morrison.

In 1988 the Kansas Department of Health and Environment ("KDHE") tested residential water wells on property adjacent to Morrison's land and determined that the water in those wells was contaminated by carbon tetrachloride. After this discovery, Morrison provided alternative water supplies to area residents. The KDHE then issued an administrative order requiring Morrison to investigate the carbon tetrachloride contamination on its property. Morrison hired Kejr Science Group, Inc. ("Kejr"), an environmental consulting firm, to investigate the source and extent of the contamination. Kejr was, until at least the time of the district court's final decision in this case, in charge of conducting tests on the property to study the contamination.

Morrison entered into a consent order with the KDHE in late 1992 in which Morrison agreed to investigate the contamination on the site and to take corrective action to address that contamination. Under the order, Morrison was to develop a workplan describing its future activities on the site, a comprehensive investigation report describing the results of its investigation of the contamination on the site, and a corrective action study proposing activities to address the contamination. The KDHE reserved the right to approve or disapprove any

actions to be taken by Morrison. Kejr was hired by Morrison to prepare the work plan, the comprehensive investigation report, and the corrective action study. Kejr subsequently completed all three documents, which were approved by the KDHE in May 1993, October 1994, and August 1997, respectively. Morrison paid Kejr for all of these activities, and as of June 30, 1997, the total expenditures by Morrison were over $430,000. The district court found that Morrison "has performed all activities required of it under the Consent Order with the KDHE." (1 Appellant's App. at 291.)

At approximately the same time that Morrison was addressing the contamination on its property, the KDHE and the United States Environmental Protection Agency ("EPA") developed a "state deferral pilot program" in which the EPA allowed the state to lead the way in addressing contamination at a number of sites throughout Kansas. (1 id. at 291–92.) Initially approved by the EPA in October 1994 and approved in a revised form in July 1995, the program provided that the KDHE's program for cleaning up sites where hazardous wastes had been released was in compliance with various requirements of federal law. The EPA retained oversight authority for the program, required the KDHE to submit regular reports, and reserved the right to require that any particular site in the program be removed from the state deferral program and directly handled by

the federal government. The Morrison property was accepted into this program in 1995.

Morrison first filed suit against McShares in December 1992, seeking monetary damages under CERCLA based on the 1963 spill. Morrison failed to comply with a deadline for disclosure of expert witnesses, and as a result, the district court entered an order precluding Morrison from calling expert witnesses in that case. Upon a motion by Morrison, the district court subsequently dismissed the lawsuit without prejudice.

Morrison refiled its complaint on June 8, 1994, seeking monetary damages to cover Morrison's expenses for investigating and cleaning up the site, and a declaratory judgment that McShares would be liable for the future costs of cleaning up the site. Once again, Morrison's counsel failed to comply with disclosure deadlines, and the district court entered an order precluding Morrison from using expert testimony at trial. As the case proceeded to trial, Morrison made a number of motions to reconsider or narrow the scope of the court's preclusion order. All motions were denied by the district court.

A three-day bench trial was held in August 1997. During the trial, the court excluded evidence proffered by Morrison on the grounds that the evidence was covered by the preclusion order.

After the trial, the district court found that Morrison had met its burden of proving all of the prima facie elements of liability under CERCLA except two—compliance with the National Contingency Plan ("NCP") and the reasonableness and necessity of Morrison's costs[1]—and that Morrison's inability to call expert witnesses was fatal to its capacity to meet its burden on those points. The district court accordingly entered judgment on the monetary claims in favor of McShares, but it also entered declaratory judgment in Morrison's favor on the points of prima facie liability that Morrison had succeeded in establishing at trial. The district court specifically held that Morrison would not be precluded from establishing consistency with the NCP with respect to future costs it might incur in cleaning up the site.

Morrison timely appealed, challenging the district court's dismissal of one of its CERCLA claims, the district court's failure to grant it a presumption of compliance with the NCP, and the propriety of the district court's preclusion order and the order's application throughout the case. Morrison also argues that the district court should have issued a declaratory judgment establishing the

---

[1] Although the district court found that Morrison had shown that its costs were otherwise reasonable and necessary, the court nonetheless concluded that Morrison could not succeed on this element because Morrison had failed to show that its costs were consistent with the NCP. (1 Appellant's App. at 321.) Thus, if Morrison is able to show consistency with the NCP, it will also have met its burden on the requirement of reasonable and necessary costs.

extent of McShares's liability for cleanup costs. McShares cross-appealed, arguing that the district court erred in granting Morrison any favorable partial declaratory judgment.

## II

CERCLA was enacted by Congress in 1980 as a response to the Love Canal hazardous waste disaster. Its purpose is to establish "a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." Pub. Serv. Co. of Colo. v. Gates Rubber Co., 175 F.3d 1177, 1181 (10th Cir. 1999) (quotation omitted). CERCLA was amended in 1986 by the Superfund Amendments and Reauthorization Act, Pub. L. No. 99-499, § 101 et seq., 100 Stat. 1613, in order "to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." Id. (quotation omitted).

CERCLA requires that releases of hazardous materials be reported to the appropriate federal authorities, 42 U.S.C. § 9603, and authorizes the President to respond to such releases, including both emergency responses and long-term remediation actions, id. § 9604. It also requires that the President develop the NCP, which is to be used to guide federal, state, and private actions that respond to releases of hazardous wastes. Id. § 9605. The NCP must establish criteria for

the development of a National Priorities List, which is a list of sites where releases have occurred that have the highest national priority for remediation efforts. § 9605(a)(8). CERCLA also prescribes specific statutory requirements for the response process and cleanup standards. Id. §§ 9604, 9616, 9617, 9621. A national "Hazardous Substance Superfund" may be used by the federal government to provide immediate funds to respond to releases. Id. § 9611. Parties that have expended funds to respond to hazardous waste releases, whether they are federal, state, or private, may in turn recoup their costs from parties that might be liable under the statute, commonly known as "potentially responsible parties" or "PRPs." Id. § 9607(a).

Liability under § 9607 (sometimes known as § 107 of CERCLA) attaches to four categories of individuals: current owners and operators of the facility where the release occurred, § 9607(a)(1); any party that owned or operated the facility where the release occurred at the time that hazardous substances were being disposed at that facility, § 9607(a)(2); any party that arranged for disposal or treatment of hazardous substances at that facility, or who arranged for transport for disposal or treatment, § 9607(a)(3); and any party that accepted hazardous waste for transport to that facility if the party selected the facility as the destination for the waste, § 9607(a)(4). Liability is strict, joint, and several under § 9607. United States v. Colo. & E. R.R. Co., 50 F.3d 1530, 1535 (10th Cir.

1995). Plaintiffs may recover, inter alia, "any . . . necessary costs of response incurred . . . consistent with the national contingency plan." § 9607(a). Section 9607(b) provides very limited defenses to liability.

A separate provision of the law applies where there are other PRPs that might be liable but one individual PRP is held responsible for the entire cost of a cleanup because of the joint and several liability. Under § 9613(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a)." Thus, an individual PRP who has been left with the entire cleanup cost of a site may attempt to share his liability with other PRPs under § 9613. Liability is to be apportioned using "equitable factors." § 9613(f)(1).

Overall, CERCLA provides the government and private parties with a powerful tool to obtain funding from PRPs to pay for the cleanup of hazardous-waste sites. Because liability is strict, joint, and several, CERCLA plaintiffs under § 9607 need not show that the defendant caused the release of hazardous wastes that required response actions. Colo. & E. R.R., 50 F.3d at 1535. Moreover, the burden rests on a defendant who has only contributed a fraction of the waste to show that the harm from his actions is divisible from the harm caused by the waste of other defendants. Id.

## III

The first challenge raised by Morrison is that the district court erred in granting McShares summary judgment on Morrison's claim for full compensation under § 9607(a), leaving Morrison's claim for contribution under § 9613(f) as its sole CERCLA cause of action.

Because this question was decided on summary judgment, we review the district court's decision de novo, applying the same standards used by the district court. Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms, 165 F.3d at 1326. "If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law." Id.

In analyzing the interaction of §§ 9607(a) and 9613(f), this Circuit has previously held that where one PRP sues another PRP for reimbursement of cleanup costs imposed as a result of a previous lawsuit or administrative order by

the EPA, the plaintiff PRP must proceed under the contribution provisions of § 9613(f) and is barred from proceeding under § 9607(a). Sun Co. v. Browning-Ferris, Inc., 124 F.3d 1187, 1190 (10th Cir. 1997). Morrison does not argue that Sun Co. is distinguishable because it was forced to expend funds on cleanup by a state administrative order.

Thus, the determination of whether Morrison may proceed under § 9607(a) depends on whether Morrison is or is not a PRP. In the summary judgment proceedings, neither party disputed that Morrison is the landowner of the property in question. As an "owner and operator of . . . a facility" at which a hazardous waste release has occurred, Morrison is a PRP, § 9607(a)(1), unless it qualifies for one of the limited defenses under § 9607(b). Indeed, Morrison argues that it qualifies for those defenses and therefore it should be able to proceed under § 9607.

We agree with Morrison that a party that can show that it is entitled to one of the defenses under § 9607(b) should be able to sue under § 9607(a); after all, such a party is not a PRP for purposes of the statute. Section 9607(b) provides defenses to liability under CERCLA where the release of hazardous material has been caused by an act of God, 42 U.S.C. § 9607(b)(1), an act of war, § 9607(b)(2), or by certain third parties, § 9607(b)(3). Releases by a third party who is an "employee or agent" of the party seeking to avoid liability do not,

however, qualify for the defense.  Id.  Nor do parties qualify for the defense where the release at issue was caused by a third party's "act or omission" that occurred "in connection with a contractual relationship, existing directly or indirectly" between that third party and the party seeking to avoid liability.  Id.

Morrison conceded in its response to McShares's summary judgment motion that the spill of carbon tetrachloride on the Morrison property—upon which its liability theory depended—occurred while McShares was preparing to unload fumigant as part of a delivery to Morrison.  Thus, there is no genuine issue as to the material fact that the spill was the result of an act or omission by McShares that occurred "in connection with a contractual relationship" between Morrison and McShares—the sale and delivery of grain fumigant from McShares to Morrison.  As a matter of law, Morrison does not qualify for the third party defense under § 9607(b)(3).

Morrison also makes elliptical arguments that even if it does not qualify for any of the defenses under § 9607(b), it is an "innocent PRP" that should be permitted to pursue recovery under § 9607(a) because "it has no responsibility for the spill."  (Appellant's Br. at 23.)  In particular, Morrison points to Sun Co., 124 F.3d at 1191 n.1 ("We express no opinion on whether PRPs who assert their innocence with regard to any waste at a site may be able to recover all of their costs from other PRPs in an action under § [9607]."), and argues that Sun Co.

indicates that the Tenth Circuit has created an "innocent PRP" exception to the rule that PRPs may only proceed with an action for contribution.

The Seventh Circuit has explicitly held that a PRP who does not qualify for the defenses under § 9607(b)(3) may nonetheless pursue an action under § 9607(a) if the PRP is a landowner who is sufficiently "innocent." See Nutrasweet Co. v. X-L Eng'g Co., 227 F.3d 776, 784 (7th Cir. 2000) (citing Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994)). A few federal appeals court decisions have also indicated in dicta that even PRPs who cannot rely on the defenses in § 9607(b) might nonetheless be able to proceed under § 9607(a) if the PRPs are liable only because they own the property in question and have not contributed to the site contamination. See In re Reading Co., 115 F.3d 1111, 1120 (3d Cir. 1997); see also Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 351 n.10, 352, 354 (6th Cir. 1998) (refusing to reach the issue).

We first note that the language in Sun Co. cited by Morrison demonstrates solely that the question was not decided by the court. See 124 F.3d at 1191 n.1. More importantly, we conclude that the exception adopted by the Seventh Circuit does not square with the underlying purposes of CERCLA. See Bedford Affiliates v. Sills, 156 F.3d 416, 425 (2d Cir. 1998).

-13-

There may be a superficial attraction to allowing "innocent PRPs" to proceed under § 9607(a). Because these landowners had nothing to do with the release of hazardous waste, it seems reasonable that they should not be forced to bear any of the costs of cleanup whatsoever. Under § 9607(a), if the landowners succeed in showing that the defendants are liable, the entire cost of cleanup would be shifted automatically to the defendants, because they are strictly, jointly, and severally liable. Under § 9613(f), on the other hand, even if the landowners succeed in showing that defendants are liable, the landowners face the additional step of dividing liability among the various parties (including, potentially, the plaintiffs) according to equitable factors.

Thus, under § 9613(f), there is a theoretical risk that "innocent PRPs" might bear some of the costs of liability. Nonetheless, we see little risk of this result occurring. If the plaintiffs are truly "innocent PRPs," then there should be little difficulty in making the additional required showing that the defendant PRPs should bear the entire cost under the equitable factors. See Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1301 n.3 (9th Cir. 1997).

In addition, it might be unfair to allow "innocent PRPs" to proceed under § 9607 and transfer all of the potential liability to other PRPs because there may be "orphan shares" of liability for bankrupt or judgment-proof defendant PRPs that should be equitably divided among the plaintiffs and other defendant PRPs.

-14-

See id. at 1303. Of course, the defendant PRPs may attempt to reimpose that liability on the plaintiff PRPs (or other PRPs) through a new contribution action under § 9613(f), but that result would lead to a "chain reaction of multiple, and unnecessary lawsuits." Id. at 1303 (quotation omitted); see also Centerior Serv., 153 F.3d at 354 (noting that allowing PRPs to pursue § 9607 actions could result in "unnecessary litigation, time and expense").[2]

Because Morrison is the landowner of the property in question and because it cannot rely on any of the defenses in § 9607(b), it is a PRP under CERCLA. And because Morrison is a PRP, it may not proceed with two independent suits under both §§ 9607 and 9613(f), but instead may only proceed with an action for contribution under § 9613(f). Accordingly, the district court did not err in dismissing Morrison's § 9607 claim on summary judgment.

_____

[2] One court has stated that a PRP who voluntarily cleans up his property without first having been sued by the EPA or a private party may not pursue a contribution action under § 9613, because, for a right to contribution to exist, a party must not have voluntarily discharged his obligations. See Aviall Servs., Inc. v. Cooper Indus., Inc., 263 F.3d 134, 142–43 (5th Cir. 2001); see also Centerior Serv., 153 F.3d at 351 n.10 (noting but not deciding the issue). The same court has also held that a PRP who has not first been sued by the EPA or another PRP may not seek contribution, because § 9613(f)(1) of CERCLA only provides for a right to contribution during or following a federal government enforcement action or a civil suit by a private party. See Aviall Servs., 263 F.3d at 145. However, McShares has never challenged Morrison's ability to seek contribution. We therefore do not reach the question of whether our analysis would change if a PRP was unable to pursue an action for contribution and would therefore be barred from any recourse under CERCLA.

## IV

When a plaintiff proceeds under § 9613(f), the success of its contribution claim is "dependent on the establishment of a prima facie case of liability under [§ 9607(a)]." County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1517 (10th Cir. 1991).

The elements of a prima facie case of liability under § 9607(a) require a showing (1) that the defendant is a "covered person" under CERCLA; (2) that a "release" or "threatened release" of any "hazardous substance" at the site in question has occurred; (3) that the release or threatened release caused plaintiff to incur costs; (4) that plaintiff's costs are "necessary" costs of response; and (5) that plaintiff's response action or cleanup was consistent with the NCP. See Pub. Serv. Co., 175 F.3d at 1181 n.5. The district court determined that Morrison had met its burden of establishing a prima facie case for the first three elements. Neither of the parties challenge the district court's conclusions on these points. The district court also determined that Morrison had failed to meet its burden of establishing consistency with the NCP, a determination that further led the district court to decide that Morrison was unable to show that its costs were "necessary." Morrison challenges this conclusion on appeal.

The district court found that Morrison was unable to meet its burden on this point because Morrison had been unable to call any expert witnesses on its behalf

to establish consistency with the NCP. (See 1 Appellant's App. at 314 ("It is here that expert evidence would be necessary for the court to evaluate whether Morrison's response actions were sufficient to meet the requirements of the NCP.").) Morrison argues that the district court failed to grant it a presumption of compliance with the NCP, a presumption that might have allowed Morrison to overcome its inability to call expert witnesses. According to Morrison, such a presumption is warranted because its cleanup procedures were supervised and approved pursuant to the consent order imposed by the KDHE, which in turn had received approval from the EPA. Because there are no relevant factual issues in question, Morrison's claim that a presumption of compliance is required is a question of law that we review de novo. See Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc., 100 F.3d 792, 796 & n.4 (10th Cir.), amended by 103 F.3d 80 (10th Cir. 1996).

The NCP is a long and detailed list of procedures that must be carried out by federal and state governments when they are responding to hazardous waste releases. The NCP specifies requirements for the two types of response actions at CERCLA sites: "removal," which is generally characterized as a short-term response to reduce the immediate threat from the release to human health and the environment, and "remediation," which is generally characterized as a response action intended to permanently reduce or eliminate the threat from the release. 40

-17-

C.F.R. § 300.5 (defining "removal" and "remedial" actions). Both types of actions have substantial requirements, but the requirements for remedial actions are much more detailed and onerous.

Most of the requirements for both removal and remedial actions have been made applicable to private parties that seek to perform their own cleanup actions at CERCLA sites, id. § 300.700(a), and under the EPA regulations, private parties that seek to be reimbursed by PRPs for cleanup costs pursuant to § 9607(a) must show compliance with those provisions of the NCP, § 300.700(c). Private parties need only show "substantial compliance" with the NCP in order to meet the requirements of § 9607(a), § 300.700(c)(3)(i), and must also show that their cleanup is a "CERCLA-quality cleanup," id.

The burden on a private party to show compliance with the NCP in order to make out its prima facie case under § 9607(a) is ordinarily not an easy one, but the EPA regulations have made that job much easier in certain situations. Where a private party is cleaning up a site pursuant to an administrative order issued by the EPA under 42 U.S.C. § 9606 or pursuant to a consent order entered into between the party and the EPA under 42 U.S.C. § 9622, the regulations establish an irrebuttable presumption that the private party's actions were consistent with the NCP. 40 C.F.R. § 300.700(c)(3)(ii) ("Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of

-18-

CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'"); see also Bancamerica, 100 F.3d at 796–97 (discussing the presumptions).

While the EPA has laid out detailed provisions for determining whether a private party has complied with the NCP and therefore is eligible to recover its costs under § 9607(a), the EPA has also indicated that its regulations are not to be interpreted as displacing the role of the courts as the ultimate arbiter of whether and to what extent the NCP compliance requirement has been met. See National Oil and Hazardous Substance Pollution Contingency Plan ("NOHSPCP"), 55 Fed. Reg. 8666, 8794 (Mar. 8, 1990) ("[T]he final rule provides a standard against which to measure 'consistency with the NCP,' but does not eliminate the very important role of the courts in deciding, on a case-specific basis, what costs should be awarded to the party that has undertaken the cleanup.").

We turn to Morrison's specific claim—that it is entitled to a presumption that its cleanup actions were consistent with the NCP because those actions were conducted pursuant to a consent order with the KDHE. As noted above, a presumption does exist for compliance with the NCP where the private party has complied with the EPA orders. However, in this case Morrison did not comply directly with the EPA orders, but rather with orders from a state agency, the KDHE. Thus, the formal conditions necessary for the regulatory presumptions

-19-

established by the EPA have not been met, although at least one other court has concluded that compliance with state agency orders is sufficient to establish compliance with the NCP. See Nutrasweet, 227 F.3d at 791.

Morrison relies on the Cooperative Agreement between the EPA and the KDHE to argue that compliance with the KDHE consent order, and oversight by the KDHE of Morrison's cleanup, meant that Morrison was effectively under the supervision and control of the EPA as well, and that therefore Morrison is entitled to a presumption of compliance. The Cooperative Agreement between the EPA and the KDHE was part of a pilot "State Deferral Program" undertaken by Region VII of the EPA. (2 Appellant's App. at 426.) Deferral programs—which have been proposed by the EPA since the late 1980s, see NOHSPCP, 53 Fed. Reg. 51394, 51415 (Dec. 21, 1988)—are programs by which the EPA defers the listing of hazardous waste sites on the National Priorities List and instead allows other federal agencies or state governments to proceed with cleanup at the site under other federal laws or state laws, see id. The reasoning of the EPA was that by deferring listing of sites on the National Priorities List, those sites could be cleaned-up using resources from other governmental agencies, resulting in faster cleanups and a more efficient use of governmental resources. Id. Deferral programs were highly controversial, and the EPA decided against implementing

them on a nationwide basis when it developed its revised NCP in 1990.  See

NOHSPCP, 55 Fed. Reg. at 8667.

When the EPA was considering implementing a deferral program in the

1990 revision of the NCP, it specifically rejected suggestions that private parties

that cleaned-up sites under the oversight of state governments pursuant to deferral

programs should be entitled to a presumption of compliance with the NCP.

> [T]he decision by EPA to defer a site from listing on the NPL for
> attention by another authority does not represent a determination that
> the response action to be taken will presumptively be consistent with
> the NCP. . . .  Each response action taken under another authority
> (e.g., RCRA) for which cost recovery is sought under section
> 107(a)(4)(B) must be justified on a case-by-case basis.

Id. at 8796–97.  This initial indication by the EPA—as to whether compliance

with state orders that are part of deferral programs should result in a presumption

of compliance with the NCP—is entitled to substantial weight.

However, we also note that in the context of implementing this particular

deferral program, Region VII of the EPA strongly indicated that compliance with

the state orders, and acceptance of state oversight, would establish compliance

with the NCP.  Under the Cooperative Agreement between the EPA and the

KDHE, the EPA stated that the KDHE's system of oversight and implementation

of cleanups of hazardous waste sites in Kansas is consistent with the NCP and

achieves CERCLA-protective cleanups.  (2 Appellant's App. at 429.)  The EPA

further stated that the KDHE's cleanup activities up to June 28, 1995, performed

pursuant to the Cooperative Agreement, had been "in compliance" with the terms of the Cooperative Agreement.  (2 id. at 426.)  Furthermore, as the district court found, the deferral program "was to be the functional equivalent of going through the federal Superfund process with the EPA" (1 id. at 292), and the EPA had never disapproved of any of the KDHE's actions under the program or ordered the removal of a site from the program (1 id. at 293).  Finally, as discussed above, the KDHE had approved the documents prepared by Morrison in connection with the cleanup of the site, and the Morrison property was accepted into the deferral program in 1995.

Given the specifics of the EPA pilot program in this case, we conclude that Morrison was entitled to a rebuttable presumption of compliance with the NCP based on the fact that its actions were undertaken pursuant to a consent order with the KDHE.[3]  We are swayed by the language in the Cooperative Agreement and the EPA's later correspondence with the KDHE, language which specifically indicates that the EPA has determined that sites within the deferral program were being handled in a manner consistent with the NCP.  Moreover, the reasoning provided by the EPA when it stated that private cleanups conducted under deferral

_____

[3]  Absent EPA regulations on point, we decline to make the presumption irrebuttable, keeping in mind "the very important role of the courts in deciding, on a case-specific basis, what costs should be awarded to the party."  NOHSPCP, 55 Fed. Reg. at 8794 (emphasis added).

-22-

programs should not receive a blanket presumption of compliance with the NCP does not apply in this case, precisely because the EPA made a specific determination that this deferral program would result in cleanups that were consistent with the NCP. Lastly, our holding will encourage private parties to comply with state hazardous waste cleanup programs that the EPA has determined meet national standards and therefore will encourage cooperation in the cleanup of hazardous waste sites in compliance with CERCLA.

We hasten to add that we are not holding that a blanket presumption applies to all private party cleanups of hazardous waste sites undertaken as part of a state deferral program; our conclusion is specific to this program and this case. Cf. Pub. Serv. Co., 175 F.3d at 1179 (stating that in considering whether compliance with state orders should result in a presumption of compliance with the NCP, "the proposition may be sustainable under certain circumstances, [but] the facts here permit no such conclusion"). Pilot deferral programs may vary in their specifics across the country, and the EPA may also decide that any national program that it implements may be very different in its specifics, particularly in how it handles the issue of consistency with the NCP. We are wary of making any sweeping conclusions on the issue in light of the EPA's cautionary language in 1990. See NOHSPCP, 55 Fed. Reg. at 8796–97.

We note that this presumption is only a rebuttable presumption of

compliance. On remand, McShares may be able to further address whether Morrison's cleanup was nonetheless not compliant with the NCP—perhaps, for example, because the KDHE-approved workplan was itself inconsistent with the NCP.

## V

Morrison also raises a number of challenges related to the district court's sanction preventing Morrison from presenting expert testimony at trial. On remand the district court may in its discretion reconsider the preclusion order given that a new trial may be required. Cf. Jacobsen v. Deseret Book Co., 287 F.3d 936, 954 (10th Cir. 2002) (noting that after a remand, there is little disruption of the trial process when additional discovery is allowed); Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1230 (10th Cir. 1999) (stating that an appeal and remand "has thus eliminated any time-based prejudice" from alleged discovery violations); Wylie v. Ford Motor Co., 502 F.2d 1292, 1295 (10th Cir. 1974) ("Because we remand this matter for a new trial, we find it unnecessary to decide appellant's second contention that the trial court abused its discretion in failing to apply sanctions for appellee's alleged failure to comply with the court's discovery order."). Because reconsideration by the district court

of its preclusion order might render the question moot, we do not address whether the district court abused its discretion by imposing the sanction.[4]

## VI

Because the district court failed to grant Morrison a presumption of compliance with the NCP, we **REVERSE** and **REMAND** for proceedings consistent with this opinion.[5]

---

[4] Likewise, we do not address either Morrison's or McShares's challenges to the declaratory judgment issued by the district court, because a different outcome on the issue of compliance with the NCP and/or the presentation of additional evidence on remand might render those challenges moot.

[5] Morrison's Motion to Supplement the Record on Appeal and Limit the Appendix is granted.