FILED
United States Court of Appeals
Tenth Circuit

February 23, 2018

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA; STATE
OF COLORADO,

        Plaintiffs,

      v.

COLORADO & EASTERN RAILROAD
COMPANY,

        Defendant - Appellee.

No. 16-1374

---

NDSC INDUSTRIAL PARK, LLC,

        Intervenor - Appellant,

DENVER ROCK ISLAND RAILROAD;
UNION PACIFIC RAILROAD
COMPANY; THOMAS Z. MARS,

        Intervenors - Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:98-CV-01600-WYD)**

---

Adam L. Massaro (Michael D. Plachy with him on the briefs), Lewis Roca
Rothgerber Christie LLP, Denver, Colorado, for Intervenor-Appellant.

Kathryn A. Reilly, Wheeler Trigg O'Donnell LLP, Denver, Colorado, Attorney
for Union Pacific Railroad (Stephanie Loughner and Bethany A. Johnson, Moye
White LLP, Denver, Colorado, Attorneys for Colorado & Eastern Railroad Co.;
and William M. Schell, Opperman & Schell, P.C., Littleton, Colorado, Attorney

for Thomas Z. Mars and Denver Rock Island Railroad, with her on the brief), for Defendant/Intervenors-Appellees.

Before **MORITZ**, **KELLY**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.  INTRODUCTION

NDSC Industrial Park, LLC ("NDSC") appeals from an order of the district court dismissing its "Consent Decree Order Motion."  The district court dismissed the motion because NDSC lacked standing to enforce the terms of the consent decree.  On appeal, NDSC asserts the district court erred in concluding it (1) was attempting to enforce the consent decree, as opposed to seeking a limited declaration regarding the meaning of the consent decree; and (2) did not have standing to seek a declaration that a conveyance of property violated the terms of the consent decree.  This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms** the district court's order of dismissal.

## II.  BACKGROUND

### A.  The Consent Decree

In the late 1990s, the United States and the State of Colorado each filed complaints against Colorado & Eastern Railroad Company ("C & E") under

CERCLA.[1]  These complaints sought reimbursement of response costs associated

"with the release or threatened release of hazardous substances at the Sand Creek

Industrial Site located in Commerce City and Denver, Colorado."  In an effort to

avoid protracted litigation, the parties entered into a partial consent decree (the

"Consent Decree") on April 13, 1999.  Pursuant to the Consent Decree, C & E

agreed to sell two parcels of land, the OU3/6 Property and the OU1/5 Property

(collectively the "Properties"), and pay the net proceeds of the sales to the United

States and Colorado.[2]  The Consent Decree gave the United States a two-and-one-

half-year period during which time it could identify a potential purchaser of the

Properties and obligate C & E to sell to the identified purchaser.  Although the

Consent Decree allowed C & E to also seek out potential purchasers of the

Properties during this time period, it prohibited C & E from selling or conveying

"any Property without the prior written approval of the United States, unless the

---

[1]CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601-9675.  The complaints filed by the United States and Colorado were based on § 9607, the CERCLA provision that allows "[p]arties that have expended funds to respond to hazardous waste releases [to] . . . recoup their costs from parties that might be liable under the statute." *Morrison Entrs. v. McShares, Inc.*, 302 F.3d 1127, 1132 (10th Cir. 2002).

[2]The property at issue in this appeal, a railroad right-of-way, runs across, but is legally distinct from, the OU3/6 and OU1/5 Properties.  The record reveals the existence of a substantial question as to whether the right-of-way, or at least a part of the right, was excluded from the terms of the Consent Decree. Nevertheless, because NDSC lacks standing to seek a declaration as to the meaning of, or to enforce the provisions of, the Consent Decree, this court lacks jurisdiction to reach and resolve this issue on appeal.

United States agrees otherwise in writing." Relevant to this appeal, the Consent Decree specifically provided that its terms "shall" not "be construed to create any rights in, or grant any cause of action to, any person not a Party" to the agreement. The district court approved and entered the Consent Decree on September 9, 1999. In so doing, the district court "retain[ed] jurisdiction over this matter for the purpose of interpreting and enforcing the terms of [the] Consent Decree."

**B. The Mars Transaction**

During the relevant time periods, C & E was a wholly owned subsidiary of Great Northern Transportation Company ("Great Northern"). C & E owned certain railroad rights of way, including the right-of-way over the Properties that would eventually become subject to the Consent Decree. Denver Terminal Railroad Company ("Denver Terminal") was also a subsidiary of Great Northern. Pursuant to a 1989 easement granted by C & E to Denver Terminal, Denver Terminal operated a railroad on approximately six miles of the right-of-way. In 1993, Great Northern entered into an agreement to sell Thomas Z. Mars all of Denver Terminal's stock and assets. Pursuant to the agreement, Mars would pay for Denver Terminal, in part, by a promissory note. Of particular relevance to the instant proceedings, the agreement specifically provided that upon payment in full of the promissory note, Great Northern would require C & E to convey fee title to

the railroad right-of-way (i.e., the part of the right-of-way covered by the 1989 easement granted by C & E to Denver Terminal) for the payment of one dollar.

A dispute arose between Great Northern and Mars over the payment of the promissory note and whether Denver Terminal actually owned all of the assets set forth in the purchase agreement. This dispute resulted in state-court litigation. That litigation was settled in June 2001, when the parties entering into an agreement which modified the amount remaining due under the promissory note to $100,000; provided for a new payment period for the revised amount to be paid to Great Northern; and confirmed that upon payment in full of the revised amount, C & E would convey fee title to the right-of-way to Mars. After the revised amount was paid by Mars to Great Northern, the railroad right-of-way was conveyed from C & E to Mars by quitclaim deed dated November 2, 2001. None of the proceeds received by Great Northern from Mars were paid over to the United States or Colorado.

**C. Sale of Property Subject to the Consent Decree**

In 2002, the remediated OU1/5 and OU3/6 Properties were put up for auction by the United States pursuant to the Consent Decree. NDSC was the winning bidder. Prior to closing on the purchase of the Properties, NDSC was made aware that C & E had already conveyed its fee interest in the right-of-way to Mars. Indeed, the quitclaim deed conveying the Properties from C & E to NDSC expressly excluded the railroad right-of-way previously conveyed to Mars.

NDSC did not, during that relevant time period, ask the United States to enforce the Consent Decree by, for instance, seeking an order from the district court voiding the conveyance from C & E to Mars. Nor is there any indication in the record that Colorado or the United States would have taken any such action.[3] Likewise, there is no indication in the record NDSC sought to renegotiate the purchase price of the transaction based on the fact the deed conveying the Properties to it specifically excluded the railroad right-of-way. Instead, in 2003, NDSC proceeded with the purchase of the Properties for the previously agreed-to sum.

## D. The Instant Litigation

In 2014, NDSC filed suit in Colorado state court to quiet title to the railroad right-of-way against C & E, Mars, and Mars's assigns and/or successors-

---

[3]The United States and Colorado filed a "Joint Submission" in the district court. In that Joint Submission, they noted "it appears" C & E's conveyance to Mars violated the Consent Decree, at least as regards the OU1/5 Property. The Joint Submission recognizes, however, that both the United States and NDSC were aware of the conveyance to Mars and that "[d]espite the issues surrounding title to the OU1/5 Property . . . , NDSC went through with the purchase." Finally, the Joint Submission disclaims any intent on the part of the United States or Colorado to enforce the terms of the Consent Decree:

[C & E's] apparent violation of the Partial Consent Decree . . . neither significantly impacts the interests of the [United States or Colorado] nor the consideration that [they] received under the Partial Consent Decree. Therefore, [they] have not and, based on the facts known to [them] today, do not intend to initiate a contempt proceeding or take other action against [C & E] for its apparent violation of the Partial Consent Decree.

in-interest. The state trial court determined the resolution of NDSC's quiet title action turned on the question whether C & E's conveyance of the railroad right-of-way to Mars in 2001 violated the terms of the Consent Decree.[4] According to the state court, "only the U.S. District Court for the District of Colorado has the power to 'interpret and enforce'" the Consent Decree. Given this jurisdictional ruling, the state court administratively closed the case. It did, however, stay its order dismissing NDSC's claims, "subject to the outcome of any federal lawsuit."

Thereafter, NDSC sought permission to intervene in the action that led to the entry of the Consent Decree. NDSC's motion to intervene specifically requested that the district court interpret the Consent Decree and enter an order enforcing the Consent Decree against C & E, Mars, and Mars's assignee. The district court allowed NDSC to intervene, but concluded as follows: "[I]n order to

---

[4]In so concluding, the state court specifically rejected NDSC's assertion that its quiet title action represented nothing more than a simple property dispute within the state court's jurisdiction:

> NDSC's characterization of this dispute as one only involving real property is somewhat misleading. It is true that, in the most general terms, NDSC['s] first and third claims are part of a quiet title action. However, the "linchpin" of these claims is whether [C & E] violated the terms of the Consent Decree when it conveyed the property at issue to Mars. The Consent Decree is thus essential to resolving who has title to the property, and any jurisdictional questions must involve which court has jurisdiction to resolve disputes that involve interpreting or enforcing the terms of the Consent Decree.

obtain the Court's consideration, NDSC shall refile its Motion to Enforce Consent Decree Order as a separate motion allowing a proper response and reply."

After NDSC filed such a separate motion and the matter was fully briefed by the parties, the district court entered an order concluding NDSC's motion could only be interpreted as a request to enforce the Consent Decree and that NDSC lacked standing to seek such relief. In particular, the district court concluded as follows: (1) the terms of the Consent Decree described the parties thereto and NDSC was not such a party; (2) NDSC could not "piggyback" on the standing of one of the described parties to the Consent Decree because there was no current case or controversy pending before the court on the part of those parties; and (3) NDSC did not have standing as a purported intended beneficiary of the Consent Decree because the terms of the Consent Decree made absolutely clear it did not create any rights in individuals or entities that were not parties to the Decree.

## III. ANALYSIS

On appeal, NDSC asserts the district court erred in determining it (1) was seeking enforcement of the Consent Decree and (2) lacked standing to seek a declaration that the conveyance of the railroad right-of-way from C & E to Mars in 2001 violated the Consent Decree. For purposes of resolving this appeal, this court will assume NDSC requested nothing more from the district court than a simple declaration that C & E violated the Consent Decree when it conveyed the

right-of-way to Mars.[5] Furthermore, because it does not address the issue on appeal, NDSC has forfeited any argument the district court erred in concluding it lacks standing to seek enforcement of the Consent Decree. Thus, the only question left on appeal is whether NDSC has standing to seek a mere declaration that the 2001 conveyance from C & E to Mars violated the terms of the Consent Decree. The answer to that question is an unequivocal "no."

---

[5]For all those reasons set out in the district court's order denying NDSC's Motion for Reconsideration, this is a dubious assumption. As noted by the district court,

> Although NDSC argues in its present Motion that it "sought no further relief" in its initial motion other than an interpretation by the Court of the Consent Decree and whether the 2001 land conveyance violated the terms of the Decree, it is clear that it sought something more, specifically that the Court would "find that the [Consent Decree] was violated and, as such, that the purported conveyance from [C & E] to Mr. Mars is invalid and void." In its initial motion, NDSC argued that the Court has the power to "enforc[e] the order against those who violate or interfere with it." Further, NDSC argued that the Court has the power to "interpret[] its own order and issu[e] commands to effectuate that order." NDSC urged the Court to find that [C & E] violated the Consent Decree by making an unauthorized conveyance, and by failing to pay sale proceeds to the United States, and that since the conveyance was allegedly made in violation of the Consent Decree, the Court should find it invalid and void. What NDSC asked the Court to do was more than just interpreting terms of the Consent Decree. It asked the Court to enforce the terms of the Decree against [C & E] by finding that [C & E's] conveyance is invalid and therefore void.

Thus, it is far from clear that NDSC preserved the argument it now advances on appeal. Nevertheless, because NDSC's assertion that it has standing to seek a declaration as to the meaning of the consent decree clearly fails on the merits, it is unnecessary to resolve the question of preservation.

Article III standing is a fundamental requirement for any party seeking relief in federal court. *City of Colo. Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1078 (10th Cir. 2009) ("Any party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims." (quotation omitted)). As the party seeking to proceed in a federal forum, NDSC bears the burden of establishing the existence of standing. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016). To do so, NDSC must show (1) it has an injury in fact to a legally protected right, (2) the claimed injury was caused by the actions of C & E, and (3) the relief requested from the district court will redress the injury. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005). Whether NDSC has established the existence of standing is a question of law subject to de novo review. *Colo. Outfitters*, 823 F.3d at 544.

Because the record conclusively establishes that the relief requested by NDSC will not redress any assumed injury to it caused by C & E, we resolve NDSC's appeal on that basis. Even under the 'lightened" burden for establishing standing at the pleading stage, *Cressman v. Thompson*, 719 F.3d 1139, 1144 (10th Cir. 2013), the record conclusively establishes that a declaration on the part of the district court that the C & E conveyance to Mars in 2001 violated the Consent Decree will not, to any degree, redress NDSC's alleged injury.

In support of its assertion such a declaration will redress its alleged injury, NDSC asserts that having obtained such a declaration, it "will return to the state

court to ask the court to hold that NDSC has established a superior claim of title over Mars" and Mars's assignee. The problem with this assertion is the state court has already made clear that whether a violation of the Consent Decree would lead to the conclusion the deed from C & E to Mars is void or voidable is a question of enforcement within the exclusive jurisdiction of the federal district court. NDSC has not pointed to anything in the record indicating the state court would deviate from this commonsense ruling merely because the federal district court issued a limited interpretive declaration as to the meaning of the Consent Decree. Instead, NDSC asserts, in entirely *ipse dixit* fashion, that any actions it takes in the future in state court to obtain superior title to Mars and Mars's assignee would not amount to enforcement of the Consent Decree because it is not directed at any of the Consent Decree's signatories. This assertion is entirely unconvincing. As made clear above, the quitclaim deed under which NDSC acquired the Properties from C & E specifically excluded the railroad right-of-way previously conveyed to Mars. The only legal theory upon which NDSC claims superior title to the right-of-way over Mars is that the Consent Decree renders the deed from C & E to Mars void or voidable. Thus, in seeking superior title to the right-of-way, NDSC is, most certainly, seeking to enforce the terms of the Consent Decree. It is for this very reason that the state court concluded it lacked jurisdiction over NDSC's quiet title action.

Because NDSC has not demonstrated even the slightest possibility that the declaration it seeks could lead toward the redress of its alleged injury, it has failed to demonstrate it has standing to seek such a declaration.

## IV.  CONCLUSION

For those reasons set out above, the order of the district court dismissing NDSC's Consent Decree Order Motion for lack of standing is hereby **AFFIRMED**.